# In the United States District Court
## District of South Carolina
## Charleston Division

| | | |
|---|---|---|
| Stanley Brown, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case Number 2:11-cv-00466-DCN |
| | ) | |
| City of Charleston; | ) | |
| Justin Kursch, | ) | |
| John L. Moore, | ) | |
| Brian C. Bunn, each sued individually; | ) | |
| the Medical University of South Carolina, | ) | |
| Jeffrey Bush, M.D., sued in his individual | ) | Deprivation of Civil Rights |
| capacity, Nurse Phillips, in her individual | ) | Negligence (SC Tort Claims Act) |
| capacity; Gregg Thomas, in his individual | ) | Medical Malpractice |
| capacity, and Al Cannon, in his official | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

# Amended Complaint

1.    This is an action under state and federal law for money damages and injunctive relief.  It is brought pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 1988, the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States, and under the Constitution and laws of South Carolina.

2.    Originally filed in state court, the action was removed to the federal court under the federal removal statutes.  Federal jurisdiction is also independently present by way of federal question jurisdiction, 28 U.S.C. § 1331, and pendent jurisdiction of state law claims.

3.     The case arises from an arrest of Stanley Brown in 2010 by City of Charleston police officers named as defendants, and the delay associated with his obtaining medical care.

4.     Documents referred to in this complaint and attached to it as exhibits are incorporated into the complaint pursuant to Fed. R. Civ. P. 10(c).

5.     Before his February 1, 2010 arrest, Mr. Brown was physically capable of walking, running, and otherwise controlling his legs.

6.     As a result of that 2010 arrest and the events set forth in this complaint, Mr. Brown is irrevocably paralyzed below his upper torso.

7.     The City of Charleston is a political entity within Charleston County authorized to sue and be sued.  Among other things, it operates a police force.  It is referred to in this complaint as the City.  The City is sued for injunctive relief only.

8.     At all times pertinent to this complaint, Justin Kursch, J.L. Moore, and B.C. Bunn, each sued individually, were police officers with the City of Charleston who had contact with Stanley Brown on February 1, 2010.  When referred to collectively, they are identified as "the CPD defendants."  The City of Charleston Police Department is referred to in this complaint as the CPD.

9.     Al Cannon is the Sheriff of Charleston County.  In this complaint, he is referred to as the Sheriff.  The Sheriff operates the Charleston County Detention Center, referred to in this complaint as the Detention Center.  The Sheriff has a contract to provide medical services to detainees at the Detention Center.  That contractor is Carolina Center for Occupational Health, LLC., a domestic, for-profit limited liability company with an agent for service of process in North Charleston, SC.  The company is referred to in this complaint as CCOH.  CCOH employees are alleged to have acted both below the

standard of care for medical professionals, and to have exhibited deliberate indifference in response to the prisoner's needs for purposes of 42 U.S.C § 1983 and related claims. CCOH itself is not a "person" within the meaning of 42 U.S.C. § 1983.

10.     Nurse Phillips is an employee of CCOH working as contract medical provider at the Detention Center.  She is sued individually under deprivation of civil rights violations.  A CCOH nurse, identified in documents as Nurse Phillips, made two evaluations of Mr. Brown on February 1, 2010.  In the first, she accepted him to the Detention Center despite his articulated, and obvious, medical needs.  In the second, she determined he could be housed in a jail cell rather than be placed for further observation. At all times pertinent to this complaint, she acted under color of state law.

11.     An individual known identified in documents as Gregg Thomas (or Thomas Gregg), is an employee of either the Sheriff of Charleston County or of CCOH. He is sued individually.  At all times pertinent to this complaint, he acted under color of state law.

12.     The Medical University of South Carolina is an entity providing medical care in South Carolina created by, and operated by, the State of South Carolina.  It is referred to in this complaint as MUSC.  As is alleged in more detail below, it is sued for injunctive relief, and for damages under state law.

13.     Jeffrey Bush, M.D. is a medical doctor who works in the emergency room of MUSC, and was on duty the night of the events related in this complaint.  He was responsible for, and oversaw, the care of Stanley Brown on February 1, 2010.  He is sued individually for damages.

Factual Background

14.     Sunset on February 1, 2010 in Charleston was 5:52 p.m.

15.     On February 1, 2010, at about 7 p.m., defendants Kursch, Bunn, and Moore were on patrol in Charleston for the CPD.

16.     Defendant Moore was alone in marked police cruiser 107.

17.     Defendants Bunn and Kursch were in marked police cruiser 170, with Kursch driving.

18.     Mr. Brown was on the street with another person.  Defendant Moore's car came in proximity of Mr. Brown.

19.     Defendant Moore attempted to initiate a "person stop" on Mr. Brown.

20.     Defendant Moore was not stopping Mr. Brown because he had any particular information about Mr. Brown.  Defendant Moore "wanted to get out and talk to him."

21.     Defendant Moore shone the squad car's spotlight on Mr. Brown.

22.     When defendant Moore shone the spotlight on Mr. Brown, defendants Kursch and Bunn were about 25 feet away from defendant Moore.

23.     At the time, Mr. Brown was physically capable of running, and he responded to the spotlight by running.

24.     Defendant Moore left cruiser 107 and began to chase Mr. Brown on foot.

25.     Defendant Kursch moved his car in front of Mr. Brown and stopped it, to try to stop Mr. Brown and to allow defendant Bunn to get out.

26.     Defendant Bunn left cruiser 170 and also began to chase Mr. Brown on foot.  Both defendants Moore and Bunn were chasing Mr. Brown on foot.

4

27.    When defendant Kursch moved his car in front of Mr. Brown, Mr. Brown changed the direction in which he was running.

28.    Defendant Moore called out to Mr. Brown to stop or he would use his taser on Mr. Brown.

29.    Upon officer Moore's warning, Mr. Brown stopped running and put his arms in the air, as he had been commanded to do.

30.    Officers have testified that Defendant Bunn collided with Mr. Brown when Mr. Brown stopped.  That collision was not recorded in any contemporaneous documents by CPD, EMS, MUSC, the Detention Center, or of any of the defendants.  Mr. Brown has testified that he was not struck until after he was on the ground.

31.    Medical personnel from MUSC would later submit a bill for services that identified an injury to Mr. Brown from pedestrian collision.

32.    On February 1, 2010, Mr. Brown stopped fleeing and went to the ground voluntarily.  As testified to by Sergeant Roger Owen of the CPD, Mr. Brown "laid down on the ground."  Officers have testified that Mr. Brown did so voluntarily.

33.    The place where Mr. Brown went to the ground was in the street, directly in front of 17 Hanover Street, in Charleston.

34.    On the asphalt of the street, defendant Bunn was on Mr. Brown's left and defendant Moore was on Mr. Brown's right.  Defendant Kursch also got on Mr. Brown's left side.

35.    Mr. Brown told the officers that he had asthma.

36.    Mr. Brown was handcuffed.  Defendant Kursch contends that a "tussle" was involved in getting Mr. Brown into handcuffs.

37.    Mr. Brown made no other resistance.

38.    It is conceded by defendant Kursch that defendant Moore struck Mr. Brown with "a knee strike to his right side" as Mr. Brown was on the ground. Supposedly intended for "the upper thigh area," the knee strike hit Mr. Brown "in the lower rib cage."  That knee strike was documented by the police in a "use of force report" made February 1, 2010.

39.    Mr. Brown was place under arrest.

40.    Defendants Kursch and Moore picked Mr. Brown up and "escorted him" to cruiser 170.

41.    When Mr. Brown was picked up, the CPD defendants observed that on the pavement underneath where Mr. Brown had been on the ground was what would be later identified as narcotics.

42.    As defendants Moore and Kursch moved Mr. Brown to the car, defendant Kursch described Mr. Brown as "plodding."  Defendant Kursch testified, "[W]e were carrying most of his [Mr. Brown's] weight, however his feet were moving like he was trying to walk."  Mr. Brown has use of his legs at least to some extent.

43.    The CPD Incident report marked Brown 000026 recorded that Mr. Brown "had become passive resistant."

44.    Mr. Brown was taken to the rear of cruiser 170 to be searched before being placed into cruiser 170.

45.    Defendant Kursch testified that "As soon as we took him [Mr. Brown] to the car he became unresponsive."  As described by defendant Kursch, Mr. Brown lost muscle control, wasn't able to stand by himself, and had only "a very shallow pulse."

46.    EMS was called for Mr. Brown at the direction of defendant Kursch.

47.    While waiting for EMS, Mr. Brown was "laid on his side."

48.    EMS arrived.

49.    The EMS record marked Brown 000077 recorded Mr. Brown as "Unconscious, responsive only to deep pain."

50.    Mr. Brown's head was secured by EMS in a "full spineboard" and with "full CPSINE precautions."

51.    EMS documents reflect that none of the CPD defendants disclosed to EMS that Mr. Brown's arrest had featured a collision, a knee strike to the back, or any other physical trauma.  The EMS record marked Brown 000076 reflects EMS recorded "no trauma," when in fact there was trauma.  The EMS record marked Brown 000077 reflects that CPD defendants Kursch, Moore, and Bunn reported to EMS that Mr. Brown "collapsed", and that it was "unknown how hard he fell when he collapsed," when in fact Mr. Brown went to the ground voluntarily and he had sustained a collision and a knee strike to the back.  Each page is attached to this Amended Complaint.

52.    Either CPD withheld that information from EMS or EMS failed to record it.  According to the EMS record marked Brown 000077, Mr. Brown's unresponsiveness was explained by the CPD defendants as possibly because Mr. Brown "could have swallowed" narcotics.  The circumstances of Mr. Brown's trauma was not completely disclosed, and information which was disclosed was misleading and false.

53.    The disclosures by Defendants Kursch, Moore, and Bunn to EMS that Mr. Brown had "collapsed" and they did not know "how hard he fell when he collapsed" are false.  Mr. Brown did not collapse prior to arrest, and did not fall prior to voluntarily going to the ground in response to officer command.

54.    EMS transported Mr. Brown to MUSC.  When Mr. Brown arrived at MUSC his spine was protected by precautions put in place by EMS.

55.     According to MUSC video records, Mr. Brown was taken to MUSC by EMS and arrived at MUSC at approximately 7:34 pm on February 1, 2010.

56.     The CPD defendants went to MUSC with EMS.  Records reflect that Mr. Brown was placed in room 9 of the MUSC emergency room.

57.     Defendant Jeffrey Bush, M.D., was the "Attending physician" for Mr. Brown in the MUSC Emergency Department.

58.     According to the CPD defendants, "at the time the report to MUSC was completed," Mr. Brown was described as "in stable condition."

59.     Mr. Brown was treated at MUSC on February 1, but no examination was made of his vertebrae.  If any examination was made, it was insufficient to detect the fractures he had sustained to his cervical vertebrae.

60.     MUSC records indicate that on February 1 while Mr. Brown was in custody at MUSC, Mr. Brown initially had motor control of his legs, had sustained no loss of consciousness, and had sustained no head injury.  That history is false.  Either (a) that false history was provided to MUSC by each of the CPD defendants Kursch, Moore and Bunn, or (b) the CPD defendants related the history of the arrest, including the trauma from the collision with Mr. Brown and the knee strike to Mr. Brown, and MUSC falsely recorded the history, or (c) MUSC failed to determine that Mr. Brown had sustained fractures to his cervical vertebra.

61.     Without proper procedures being followed, MUSC and Defendant Bush removed Mr. Brown from spinal precautions used by EMS to protect his spine.

62.     While he was at MUSC under the care of Dr. Bush, Mr. Brown was unable to move his legs, he was unable to feel his legs, and he became incontinent.

63.     The MUSC document marked Brown 000090, provided to the Detention Center, indicates that Mr. Brown was "Neuro: Normal," had full motor control, and had no loss of consciousness or head injury.  Those representations were false.

64.     Mr. Brown related to MUSC personnel that he was unable to feel his legs. That was known to be a changed condition from the observation made by MUSC that Mr. Brown had full motor control, was neurologically normal and had full motor control.

65.     After his condition changed at MUSC, MUSC assessed Mr. Brown and confirmed that Mr. Brown could not feel his legs.  Defendant Bush was deliberately indifferent that Mr. Brown could not feel his legs.  No proper examination of Mr. Brown's condition was made by Dr. Bush or any other MUSC personnel after Mr. Brown articulated that he could not feel his legs or move his legs or after Mr. Brown became incontinent.  No imaging studies were done of Mr. Brown's spine on February 1, 2010.

66.     When his condition changed, MUSC ignored proper medical treatment protocol as to Mr. Brown, and Dr. Bush was deliberately indifferent to his medical needs represented by his inability to move or feel his legs and his incontinence.

67.     MUSC and Dr. Bush improperly cleared Mr. Brown for incarceration in the Charleston County Detention Center even though Mr. Brown's condition had changed at MUSC.

68.     As reflected on video records maintained by MUSC, Mr. Brown was taken from MUSC approximately 9:53 p.m. on February 1, 2010.

69.     Unlike when he was arrested, when officer Kursch described Mr. Brown's feet "moving like he was trying to walk," and unlike when he was recorded at MUSC as having full motor control, by 9:53 p.m. video maintained at MUSC shows that when Mr.

Brown was removed from MUSC, officers Moore and Bunn supported Mr. Brown by his arms and that Mr. Brown's legs were immobile, with his feet dragging on the ground.

70.     Defendants Moore, Bunn, and Bush were deliberately indifferent to the change which had occurred in Mr. Brown's condition while he was at MUSC.

71.     The changes to Mr. Brown's condition while he was at MUSC were serious changes to his medical condition.  The changes were understood by defendants Kursch, Moore, Bunn and Bush to be serious medical conditions.  Defendant Bush remained responsible for Mr. Brown's care even after Mr. Brown lost the use of his legs.

72.     Defendants Kursch, Moore, Bunn, and Bush each delayed proper medical care for Mr. Brown by deliberate indifference to his serious medical need of being unable to walk or feel his legs.

73.     Supporting his arms but dragging his legs, Defendants Moore and Bunn moved Mr. Brown to the police vehicle and transported Mr. Brown to the Detention Center.

74.     Upon arrival at the Detention Center, Mr. Brown continued to be unable to move his legs.  Video made at the Detention Center shows Mr. Brown in the back seat of the police vehicle in which he was transported to the Detention Center.  Mr. Brown communicated to defendants Moore, Bunn, and Nurse Phillips that he was unable to walk and unable to feel his legs.

75.     Despite Mr. Brown's inability to walk being apparent, and despite Mr. Brown conveying that he could not walk and could not feel his legs, Defendants Moore, Bunn and Phillips ignored Mr. Brown's serious medical need and, as reflected on the Charleston County record marked Brown 000080, attached to this Amended Complaint, chose to interpret Mr. Brown's condition not as the inability Mr. Brown claimed but as

Mr. Brown "refusing all orders" and "making himself dead weight." Each Defendant was deliberately indifferent to Mr. Brown's serious and obvious medical needs and made no proper assessment of Mr. Brown.

76.    As reflected on the Charleston County record marked Brown 00081, attached to this Amended Complaint, when Mr. Brown claimed he could not walk, Nurse Phillips assessed Mr. Brown and "stated he was okay for acceptance," despite Mr. Brown's having articulated in her presence that he could not walk and could not feel his legs. That record of the Detention Center states:

> I/M Brown was cleared for jail by MUSC, but still claimed he could not walk. Nurse Phillips checked the paperwork from the hospital and stated he was okay for acceptance. The I/M still would not walk on his own, so he was placed in the ERC and secured and transported into intake and booking. Nurse Phillips checked him again and stated his vital signs and overall lucid actions revealed he did not need to go to 1A in the chair for observation because he was not as high as he claimed. He was wheeled to holding cell 1618 and placed in the room without further incident.

77.    According to that record, Defendant Phillips made two assessments of Mr. Brown, one to accept him, and another after intake and booking that Mr. Brown did not require observation.

78.    Defendant Phillips violated both 42 U.S.C. § 1981 and § 1983 in being deliberately indifferent to Mr. Brown's stated medical needs. Defendant Phillips also violated the applicable standard of care in not responding to Mr. Brown's serious medical needs and his inability to either walk or feel his legs.

79.    Defendant Phillips accepted Mr. Brown in her capacity as an employee of CCCOH, pursuant to a contract between CCOH and the Sheriff of Charleston County in which CCOH provided medical services for detainees. In that capacity she acted under color of state law. Either the Sheriff, or CCOH, also employed Gregg Thomas, who also acted under color of state law.

80.    As alleged in this complaint, each of Defendants Phillips and Thomas acted within the scope of the medical services CCOH provided by contract for the Sheriff.   In that capacity, Phillips and Thomas each acted under color of state law. CCOH performed a public function, by contract, and through that contract was a joint actor with the Sheriff and his deputies.  Defendants Phillips and Thomas performed the CCOH contractual role willfully in providing medical care services to persons at the Detention Center.   Each was responsible to the Sheriff as included within the Sheriff's responsibility for "jailers."

81.    CCOH is a private, for-profit entity.  Defendants Phillips and Thomas are each private persons acting under color of state law in their capacity as employees of CCOH for its contract with the Sheriff of Charleston County.  CCOH is an independent contractor fulfilling obligations of the Sheriff of Charleston County to provide medical care for persons detailed at the Detention Center.   Defendants Phillips and Thomas are each a "person" within the meaning of 42 U.S.C. § 1983.

82.    Defendant Phillips approved Mr. Brown being moved into the Detention Center after reviewing the clearance given Mr. Brown by MUSC, and was deliberately indifferent to Mr. Brown's serious medical condition, which conflicted with the MUSC document indicating that Mr. Brown had full motor control.  Defendant Phillips undertook no steps to assess Mr. Brown's inability to walk or to feel his legs when Mr. Brown was presented by Moore and Bunn for admission to the jail.

83.    Neither Moore nor Bunn indicated that Mr. Brown's condition had deteriorated since his arrest, and since his arrival at MUSC.

84.    In deciding to accept him into the Detention Center, Defendant Phillips relied on the clearance given Mr. Brown by MUSC, the silence by officers Bunn and

Moore who were each aware of the actual circumstances of Mr. Brown's arrest (and who were also each aware that Mr. Brown's condition had deteriorated from when he had been arrested, and since he was taken into MUSC), and despite Mr. Brown's contention that he could not walk and could not feel his legs.

85.    Nurse Phillips evaluated Mr. Brown but despite his stated medical problems determined that Mr. Brown did not need to be placed under observation at the Detention Center or returned to MUSC.  Mr. Brown's stated medical problems of being unable to walk and unable to feel his legs were ignored in determining to admit Mr. Brown to the Detention Center.

86.    Defendant Nurse Phillips was not told by Moore or Bunn that Mr. Brown has sustained a collision, a knee to his back, or any other physical trauma.  Defendants Moore and Bunn withheld that information.

87.    At the Detention Center, Defendant Bunn completed a "Jail Intake Assessment Form" which is attached to this complaint and has been marked as Chas Co 00094.  Bunn completed the form in a manner that is in some respects false.  Despite knowing that Mr. Brown's condition had deteriorated sharply since his arrest and since arriving at MUSC, and that he could neither walk nor feel his legs, Bunn denied (a) that Mr. Brown had any medical condition or injury that that may require immediate medical attention, (b) that Mr. Brown needed an immediate evaluation, (c) that Mr. Brown had any behaviors that might suggest a brain injury, and (d) that any other information might assist the Detention Center.

88.    By 10:35 p.m. on February 1, Mr. Brown had been booked into the Detention Center.  At that time, he was unable to walk or feel his legs, and he had

communicated those problems to Defendants Moore, Bunn, and Phillips.  Those defendants were deliberately indifferent to Mr. Brown's medical needs.

89.    After his booking, Mr. Brown was placed in "suspended booking."

90.    Once in the Detention Center on February 1, 2010, in a record on which the time is noted as 10:35 p.m., Mr. Brown was given a "Medical Screening" by defendant Gregg Q. Thomas (or Thomas Gregg, if that is his proper designation — reference to Gregg Thomas includes reference to Thomas Gregg).  Neither Defendant Moore nor Defendant Bunn related to Gregg Thomas that Mr. Brown had sustained a collision, a knee to his back, or any other physical trauma in the course of his arrest.  That information was withheld from Gregg Thomas, as it had been withheld from Nurse Phillips.

91.    Nor did either Defendant Moore or Defendant Bunn relate to Gregg Thomas that Mr. Brown's condition had deteriorated since the time of his arrest, when he was able to use his legs, and since the time that he had been taken to MUSC and MUSC observed that he had all motor control.

92.    Independent of the information withheld by Defendant Moore and Defendant Bunn, and independent of the misrepresentations made by Bunn in the Jail Intake Assessment Form, in making his evaluation of Mr. Brown Gregg Thomas was deliberately indifferent to Mr. Brown's stated medical condition, and his actual and obvious condition, of being unable to move his legs and unable to feel his legs.

93.    The Thomas evaluation of Mr. Brown is reflected in pages marked Brown 00086 and 00087.

94. In conducting his medical screening of Mr. Brown, Gregg Thomas acted below the standard of care and was deliberately indifferent to Mr. Brown's obvious, and serious, medical needs, about which he was subjectively aware.

95. Despite knowing that Mr. Brown could neither walk nor feel his legs, in his assessment Defendant Thomas (a) denied that Mr. Brown had been taken to the hospital before intake at the Detention Center, (b) denied that Mr. Brown had been hospitalized, (c) denied that Mr. Brown had fainted or had a head injury recently, (d) denied that Mr. Brown had any physical handicaps, (e) denied that Mr. Brown had any other medical problems, (f) represented that Mr. Brown did not have a "lifeless reaction," (g) represented that Mr. Brown, who could not walk at all,  "walks w/ stagger, (h) denied that Mr. Brown was "uncooperative," and (i) denied that Mr. Brown was "passive."

96. Mr. Thomas was deliberately indifferent to Mr. Brown's serious, and obvious, medical needs in completing the "Medical Screening."

97. After he was through intake and booking, and after he was given a "medical screening" by Gregg Thomas, Mr. Brown was again evaluated by a person identified in documents as Nurse Phillips.  Nurse Phillips conversed with Mr. Brown, and her part of the conversation was recorded on videotape.  Mr. Brown's portion of the conversation is inaudible on that videotape.

98. Starting at approximately 12 minutes 26 seconds of a videotape produced by Charleston County, the nurse talking with Mr. Brown, identified in the document marked Brown 00081 as Nurse Phillips, asked him the following questions, to which Mr. Brown's responses are not audible.  The questions include:

Q:    What happened to your legs?

Q:    It just happened?

Q:    Can't feel anything?

Q:    When did you lose feeling in your legs?

Q:    It just happened?

Q:    The officer said you were running and just fell down.  Is that what happened?

Q:    You don't know what happened?

99.    The questions demonstrate both that information given by Bunn and Moore was not accurate (specifically, "the officer said you were running and just fell down," which is not correct), and that Nurse Phillips was aware that Mr. Brown had lost feeling in his legs.

100.    Mr. Brown's serious and obvious medical condition was ignored.  Nurse Philips was deliberately indifferent to Mr. Brown's serious condition and that indifference delayed his getting proper treatment for his condition.

101.    After his interview with the person identified as Nurse Phillips, the Charleston county videotape shows that Mr. Brown was taken from the emergency restraint chair in which he had been placed and was laid on the floor of a cell in the Detention Center.  Nurse Phillips determined that Mr. Brown did not require observation.

102.    Time records show that Mr. Brown was placed in a cell shortly after midnight on February 2, 2010.

103.    For approximately 8 hours, Mr. Brown laid on the floor of a cell in the Detention Center where he had been placed, unable to move his legs, unable to feel his legs, unable to control his bowels, and unable to have his complaints responded to.  Mr. Brown was anxious, upset, in distress over his condition and lack of response to his complaints, and .

16

104.     In addition to his problems with his legs, Mr. Brown had been unable to control his bowels since he had arrived at MUSC.  When he left MUSC, Mr. Brown had been dressed for incontinence.  Unable to control his bowels, and unable to move, Mr. Brown defecated on himself during the time he laid on the floor in the Detention Center on February 2, 2010.   Mr. Brown was given no assistance for that condition before 8 a.m. on February 2, 2010.  Mr. Brown lay in his own excrement the night of February 1, 2010.

105.     Mr. Brown remained on the floor to the morning of February 2, 2010. During that time his condition was unobserved, and unmonitored.

106.     The next morning, February 2, 2010, Mr. Brown's condition was unchanged in that he could not walk, could not feel his legs, and could not control his bowels.

107.     At 8:10 a.m. on February 2, 2010, a "clinical nursing evaluation" was done on Mr. Brown by an LPN named P. Simpson.  LPN Simpson recorded that Mr. Brown was still complaining he had "no feeling" from the waist down, the same complaint Mr. Brown had made on February 1, 2010, but which was ignored.

108.     LPN Simpson's evaluation of Mr. Brown appears at a page marked Brown 000089, attached to this Amended Complaint.

109.     On February 2, 2010, LPN Simpson observed no condition of Mr. Brown's that was not already visible to Defendants on February 1, 2010, and which Mr. Brown had not himself articulated on February 1, 2010.

110.     According to the records of Charleston County, at approximately 9:38 a.m. on February 2, the deliberate indifference to Mr. Brown's serious medical needs ended, and he was taken from the Detention Center back to MUSC.

17

111.    When Mr. Brown returned to MUSC from the Detention Center, the deliberate indifference by Defendants MUSC and Defendant Bush ended, and Mr. Brown's serious medical condition was for the first time properly examined and documented, and treatment was attempted.

112.    Treatment for Mr. Brown's serious medical condition was delayed for more than 14 hours, from 7:35 p.m. on February 1, 2010, when EMS records show he first arrived at MUSC, to after 9:38 a.m. on February 2, 2010, when County records show that Mr. Brown was checked out of the Detention Center and taken back to MUSC.

113.    During the delay, Mr. Brown was in distress, was not monitored or observed, could not get his complaints addressed, and was subjected to the humiliation of being compelled to lie in his own fecal incontinence.

114.    By the time deliberate indifference ended as to Mr. Brown's stated medical conditions, his paraplegia could not be reversed.  Mr. Brown is permanently paralyzed below his upper chest.

**For a First Cause of Action:**
**Deprivation of Rights Under 42 USC §§ 1981 and 1983**
(Count 1 Against Defendants City of Charleston for injunctive relief, and
for damages as to Defendants Kursch, Moore, and Bunn for Failing to
Give Proper Information to Medical Providers)

115.    Allegations above are incorporated into this count as if fully stated.

116.    Documents associated with Mr. Brown's arrest reflect that Defendants Kursch, Moore and Bunn failed to give complete and accurate information about the events associated with Mr. Brown's arrest.

117.    Mr. Brown is a citizen of the United States.

18

118.    Mr. Brown's detention and arrest constituted a "seizure" under the Fourth Amendment to the Constitution of the United States.

119.    Defendants Kursch, Moore, and Bunn at all times pertinent to this complaint were employed by the CPD and acted under color of state law.  This claim is brought against them in their individual capacities.

120.    During the period of his detention Mr. Brown was entitled to adequate medical care under the protections of the Fifth and Fourteenth Amendments as well as the state constitution.  State constitutional protections are recognized by the Constitution of the United States where not inconsistent.

121.    As of February 1, 2010, a reasonable person would have known that it was clearly established that after his arrest, Mr. Brown was entitled under the Fifth and Fourteenth Amendments to have adequate medical care during his confinement.

122.    Mr. Brown's medical condition after his arrest was objectively serious.

123.    CPD defendants Kursch, Bunn and Moore subjectively knew that Mr. Brown's medical condition was serious and that Mr. Brown needed medical attention. EMS was called for Mr. Brown and other precautions were taken on his behalf.

124.    Despite calling EMS, CPD defendants Kursch, Bunn, and Moore displayed deliberate indifferent to Mr. Brown's known serious medical need when they each (a) withheld from EMS and MUSC medical personnel that Mr. Brown had sustained a collision while running and a knee to his back, (b) denied any physical trauma was part of the arrest, and (c) provided a narrative that was misleading as to the trauma associated with Mr. Brown's arrest.

125.    Documents associated with Mr. Brown's arrest reflect only disclosures that Mr. Brown "fell" and "collapsed," disclosures both incomplete and misleading.

126.    Based on the incomplete and misleading information given by Kursch, Moore and Bunn to EMS and MUSC, MUSC medical personnel had to rely solely on Mr. Brown's condition and presenting circumstances to investigate, diagnose, and treat Mr. Brown for his actual impairments, as EMS did.  Defendants Kursch, Moore and Bunn each withheld the vital information that would have directed inquiry to Mr. Brown's actual injury by MUSC personnel and Defendant Bush.

127.    EMS took proper precautions as to Mr. Brown despite the misinformation given to them by Defendants Kursch, Moore and Bunn.

128.    Defendants Kursch, Moore and Bunn gave false speculation to account for Mr. Brown's condition, namely that Mr. Brown had "collapsed" and had "fallen," and each Defendant withheld from EMS and MUSC medical personnel the details of the trauma associated with Mr. Brown's arrest.

129.    Information withheld by Defendants Kursch, Moore caused a delay in proper medical care being given to Mr. Brown.

130.    Defendants Kursch, Moore and Bunn misrepresented critical information, and in so doing displayed deliberate indifference to Mr. Brown's constitutional right to adequate medical care.  Prior to February 1, 2010, defendants Kursch, Moore and Bunn were aware that it is unlawful to withhold information from medical personnel treating person being detained, and were aware that it was improper for them to operate using a policy or custom to withhold such information.

131.    The City of Charleston's Police Department has inadequate procedures and training sufficient to compel its police officers to fully and accurately report the history of a person in their custody that requires medical care.  The Defendant City

should be enjoined from failing to develop adequate training and procedures sufficient for that purpose.

132.    The City of Charleston Police Department has a custom or policy for its officers to withhold information whenever medical needs have arisen during the course of an arrest.  That custom or policy deprived plaintiff Brown of the rights, privileges, or immunities secured to him by the Constitution and laws of the United States as well as of South Carolina.

133.    Defendant City of Charleston has a custom or policy to not spend the additional funds needed to have the proper training for its personnel needed to effectively disclose information for purposes of providing adequate medical care for detainees.

134.    Unless enjoined, the City of Charleston will continue to fund and operate its police department in a manner which deprives detainees such as plaintiff Brown of constitutionally protected rights.

135.    Mr. Brown is entitled to injunctive relief sufficient to prevent the City of Charleston from failing to provide funds necessary to train and operate its police force so as to provide proper information when detainees require medical care.

136.    Mr. Brown has been injured as a result of the conduct of the defendants City of Charleston, Kursch, Moore and Bunn.  He was deprived of the rights, privileges or immunities secured to him by the Constitution and laws of the United States and South Carolina, and is entitled to actual and punitive damages against the individual defendants, in amounts to be determined by the finder of fact, to redress his injuries as a result of that deprivation, the delay in his receiving proper medical care, the consequential injuries from that delay, and Mr. Brown is entitled to injunctive relief against the City of Charleston.

137.    Mr. Brown is entitled to actual damages, punitive damages, and injunctive relief as to the individual defendants Kursch, Moore, and Bunn as to their conduct, in their individual capacity, in amounts to be determined by the finder of fact.

**For a Second Cause of Action:**
**Deprivation of Rights Under 42 USC §§ 1981 and 1983**
(Count 2 Against Defendants City of Charleston for injunctive relief,
and Defendants Moore, and Bunn for damages for Deliberate Indifference
to Mr. Brown's serious Medical needs when Mr. Brown left MUSC
and was taken to the Detention Center)

138.    Allegations above are incorporated into this count as if fully stated.

139.    Defendants Kursch, Moore, and Bunn provided to EMS and MUSC medical personnel inaccurate, misleading, and incomplete information about the trauma associated with Mr. Brown's arrest.

140.    Before Mr. Brown was arrested, he had use of his legs.

141.    After Mr. Brown was arrested, he required assistance but was able to support some of his weight with his legs, and was able to move his legs, as described by Defendants Kursch, Moore, and Bunn.

142.    Prior to February 1, 2010, defendants Moore and Bunn were aware that it is unlawful to withhold information from medical personnel treating a detainee, and were aware that it was improper for them to operate using a policy or custom to withhold such information.

143.    When Mr. Brown's condition worsened after his arrest, Defendants Kursch, Moore, and Bunn called EMS for Mr. Brown, and Mr. Brown was transported to MUSC.

144.    When Mr. Brown left MUSC, Defendants Moore and Bunn transported Mr. Brown to the Detention Center.

22

145.    Defendants Moore and Bunn knew, or should have known, that Mr. Brown's ability to move his legs had worsened from the time of his arrest. After he was cleared by MUSC, Mr. Brown was unable to move his legs or assist in any way with his movement from MUSC to the police car for transport to the Detention Center.

146.    Videotape from MUSC reflects that Mr. Brown was removed from MUSC by Defendants Bunn and Moore each holding one of Mr. Brown's arms, supporting Mr. Brown's weight, while his legs dragged on the floor behind him, his hands cuffed behind him.

147.    Defendants Moore and Bunn were deliberately indifferent to the serious medical need of Mr. Brown when they observed that he was unable to move his legs when he left MUSC, as compared to his ability to move his legs both before Mr. Brown was arrested, and after his arrest, but before Mr. Brown was taken to MUSC.

148.    Defendants Moore and Bunn were deliberately indifferent to the serious medical need of Mr. Brown when on arrival at the Detention Center they observed that he was unable to move his legs, as compared to his ability to move his legs both before Mr. Brown was arrested, and after his arrest, but before Mr. Brown was taken to MUSC.

149.    Defendants Moore and Bunn were each aware that Mr. Brown claimed he could not feel his legs or walk.

150.    Defendants Moore and Bunn were each aware that Mr. Brown had been able to use his legs prior to his arrest. Neither Moore nor Bunn related to Detention Center personnel the accurate account of Mr. Brown's arrest. Instead, Mr. Brown was falsely accused by defendants Moore and Bunn of "refusing all orders from officers" Moore and Bunn and of "making himself dead weight refusing to come out of the squad

car." Personnel at the Detention Center were enlisted to remove Mr. Brown from the squad car.

151.    Defendants Moore and Bunn each repeated at the Detention Center that Mr. Brown had "fallen" during his arrest, a representation that was false.

152.    Defendants Moore and Bunn at all times pertinent to this complaint were employed by the City of Charleston in its Police Department and acted under color of state law. This claim is brought against them in their individual capacities.

153.    During the period of his detention Mr. Brown was entitled to adequate medical care under the protections of the Fifth and Fourteenth Amendments. Additionally, at all times during his detention, Mr. Brown was entitled to similar protections under protections in the South Carolina Constitution, recognized by the United States Constitution through Article IV Sections 1 and 2, as well as through the Tenth Amendment.

154.    As of February 1, 2010, a reasonable person would have known that it was clearly established that Mr. Brown, like any other person under police detention, was entitled by the Constitution to have adequate medical care during his confinement.

155.    Mr. Brown's medical condition after his arrest was objectively serious, and demonstrably even more obviously so when he was unable to remove himself from the squad car at the Detention Center.

156.    Defendants Moore and Bunn were aware that no complete history had been given to MUSC or to Defendant Bush about the circumstances of Mr. Brown's arrest, yet even after Mr. Brown's incapacity became more pronounced, neither Bunn nor Moore disclosed the actual circumstances of Mr. Brown's arrest.

157.    Defendant Bunn completed the Charleston County document marked as Chas Co 00094, attached to this complaint.  In that document, Defendant Bunn actively misrepresented Mr. Brown's history, as alleged in detail above.

158.    Moore and Bunn also gave false speculation to account for Mr. Brown's condition, that Mr. Brown was electing to passively resist, when in fact he had fractures to his cervical vertebrae.

159.    Defendants Bunn and Moore subjectively knew that Mr. Brown's medical condition was serious and that he needed additional medical attention.

160.    Defendants Bunn and Moore were each deliberately indifferent to Mr. Brown's known serious medical need when they withheld from Detention Center personnel information that Mr. Brown had sustained physical trauma associated with his arrest, and when each speculated on alternatives to the known trauma associated with his arrest.   That indifference delayed Mr. Brown's proper medical care and subjected to Mr. Brown to injury during the delay that he would otherwise have avoided.

161.    For a second time, defendants Moore and Bunn misrepresented critical information to medical personnel, this time at the Detention Center, and in so doing displayed deliberate indifference to Mr. Brown's constitutional right to adequate medical care.  Prior to February 1, 2010, defendants Moore, and Bunn were aware that it is unlawful to withhold information from medical personnel treating person being detained, and unlawful to operate using a policy or custom to withhold accurate information.

162.    The City of Charleston in its Police Department has inadequate procedures and training sufficient to compel its police officers to fully and accurately report the history of a person in their custody that requires medical care.  The City should be

enjoined from failing to develop adequate training and procedures sufficient for that purpose.

163.    The City of Charleston Police Department has a custom or policy for its officers to withhold information whenever medical needs have arisen during the course of an arrest.  That custom or policy deprived Mr. Brown of the rights, privileges, or immunities secured to him by the Constitution and laws of the United States as well as of South Carolina, and subjected him to injuries which he would otherwise have avoided.

164.    Defendant City of Charleston has a custom or policy to not spend the additional funds needed to have the proper training for its personnel to effectively disclose information for purposes of providing adequate medical care for detainees.

165.    Unless enjoined, the City of Charleston will continue to fund and operate its police department in a manner which deprives detainees such as Mr. Brown of constitutionally protected rights.

166.    Mr. Brown is entitled to injunctive relief sufficient to prevent the City of Charleston from failing to provide funds sufficient to train and operate its police force so as to provide proper information when detainees require medical care.

167.    Mr. Brown has been injured as a result of the conduct of the defendants Moore and Bunn.  He was deprived of the rights, privileges or immunities secured to him by the Constitution and laws of the United States and South Carolina, and is entitled to actual and punitive damages against the individual defendants Moore and Bunn, in amounts to be determined by the finder of fact, to redress his injuries as a result of that deprivation and its consequential injuries.

**For a Third Cause of Action:**
**Deprivation of Rights Under 42 USC §§ 1981 and 1983**
(Against Defendant Gregg Thomas, individually.)

168.    Allegations above are incorporated into this count as if fully stated.

169.    Gregg Thomas is either a deputy working for the Charleston County Sheriff or an employee of CCOH performing medical care at the Detention Center. In either capacity, he is a "jailer" under state law, a "person" within the meaning of 42 U.S.C. §§ 1981 and 1983, and acted under color of state law.

170.    Once Mr. Brown was inside the Detention Center, Gregg Thomas completed a "Medical Screening" of Mr. Brown. The "screening" is two pages, marked as Brown 000086 and 000087, and is attached to this complaint.

171.    In the "screening" Mr. Thomas documented his deliberate indifference to Mr. Brown's serious medical condition by himself and others at the Detention Center, as alleged above. The "screening" actively misrepresents Mr. Brown's medical condition and Mr. Brown's history, and delayed Mr. Brown's proper medical care.

172.    Prior to February 1, 2010, a reasonable person was aware that it is unlawful to withhold proper medical care from any person who is in custody.

173.    Defendant Thomas was subjectively aware, from Mr. Brown's inability to walk and from Mr. Brown stating both that he could not feel his legs and that he could not walk, that Mr. Brown had a serious medical condition and that he needed medical attention. Mr. Brown's condition was objectively serious.

174.    Mr. Thomas was deliberately indifferent to the serious medical needs represented by Mr. Brown's paralysis, and affirmatively misrepresented Mr. Brown's serious medical needs.

175.    Defendant Thomas was obligated to provide proper medical care for Mr. Brown's condition.  Mr. Brown's medical needs were ignored by Defendant Thomas, and his medical "screening" delayed Mr. Brown's proper medical care.

176.    Mr. Brown has been injured as a result of the conduct of the Defendant Thomas, was deprived of the rights, privileges or immunities secured to him by the Constitution and laws of the United States, and is entitled to actual and punitive damages against the individual Defendants, in amounts to be determined by the finder of fact, to redress his injuries as a result of that deprivation and its consequential injuries.

**For a Fourth Cause of Action:**
**Deprivation of Rights Under 42 USC §§ 1981 and 1983**
(Against Defendant Nurse Phillips).

177.    Allegations above are incorporated into this count as if fully stated.

178.    The Sheriff of Charleston County, through a contractor, provides for medical care for persons detained at the Charleston County Detention Center.

179.    In February, 2010, the contractor providing those medical services was CCOH.

180.    CCOH employed various individuals, among them Nurse Phillips and LPN Simpson, to perform its contractual functions for the Sheriff.

181.    As a private entity, CCOH is not a "person" within the meaning of 42 U.S.C. § 1981 and 1983.  LPN Simpson and Nurse Phillips are "persons" within the meaning of the statute.

182.    Once Mr. Brown was inside the Detention Center, a nurse, designated in the documents as Nurse Phillips, examined Mr. Brown.

183.    The page marked Brown 000081 states (with emphases added):

I/M Brown was cleared for jail by MUSC, but still claimed he could not walk. **Nurse Phillips checked the paperwork from the hospital and stated he was okay for acceptance.** The I/M still would not walk on his own, so he was placed in the ERC and secured and transported into intake and booking. **Nurse Phillips checked him again and stated** his vital signs and overall lucid actions revealed **he did not need to go to 1A in the chair for observation** because he was not as high as he claimed. He was wheeled to holding cell 1618 and placed in the room without further incident.

184.    As described on page Brown 000081, Nurse Phillips undertook two evaluative steps concerning Mr. Brown, one before and one after intake and booking. She evaluated him first against the record provided by MUSC and then evaluated him again, independently, for whether he needed observation.

185.    As reflected on videotape produced by Charleston County, Nurse Phillips discussed Mr. Brown's condition both outside of the jail, before he was removed from the police car, and then met with Mr. Brown inside the jail, with officers present, before he was placed into a cell.

186.    During the "outside" conversation the video tape reveals at approximately 0 minutes 11 seconds that Mr. Brown says, from the back of the police car, "I can't walk." He repeats that he can't walk at approximately 0 minutes 23 seconds, and at approximately 0 minutes 46 seconds he says, "I got no feeling in my legs."

187.    Those comments were ignored by Nurse Phillips.

188.    In evaluating Mr. Brown against the record provided by MUSC, Nurse Phillips undertook no steps to reconcile MUSC having found that Mr. Brown had complete motor control and Mr. Brown's inability to walk or feel his legs when he presented at the Detention Center. Nurse Phillips was deliberately indifferent to Mr. Brown's serious medical need, and that indifference delayed proper treatment for Mr. Brown and subjected him to injuries during the delay.

29

189.    Nurse Phillips accepted Mr. Brown despite his articulated, and obvious, serious medical problems.

190.    In addition, during the conversation with Mr. Brown held "inside" the jail, but before he was placed in a cell, Nurse Phillips conversed with Mr. Brown.

191.    Starting at approximately 12 minutes 26 seconds of the County's videotape, Nurse Phillips asked Mr. Brown the following questions, to which Mr. Brown's responses are not audible.  The questions include:

> Q:     What happened to your legs?
>
> Q:     It just happened?
>
> Q:     Can't feel anything?
>
> Q:     When did you lose feeling in your legs?
>
> Q:     It just happened?
>
> Q:     The officer said you were running and just fell down.  Is that what happened?
>
> Q:     You don't know what happened?

192.    The questions demonstrate that information given by Bunn and Moore was not accurate, that Mr. Brown reported he could not feel his legs, and that Mr. Brown's condition had deteriorated from MUSC's observation that Mr. Brown had motor control in his legs.  Mr. Brown's serious medical condition was ignored by Nurse Phillips.  She was deliberately indifferent to Mr. Brown's serious medical needs, which delayed proper medical treatment for Mr. Brown.

193.    CCOH employee LPN P. Simpson, who is referred to in the document marked Brown 000089, interacted with Mr. Brown the following morning, on February 2, 2010, at 8:10 a.m.. LPN's Simpson's evaluation recorded what Mr. Brown had told other CCOH employees the night before, and which was apparent the night before, that Mr.

Brown could neither move his legs nor had feeling in his legs. Those facts were plainly visible to Nurse Phillips and Gregg Thomas the day before, but Nurse Simpson was the first CCOH employee to not deliberately disregard Mr. Brown's serious medical needs.

194.    LPN Simpson's evaluation caused Mr. Brown to be returned to MUSC, but after a delay of over 14 hours.

195.    Prior to February 1, 2010, a reasonable person working for CCOH under contract with the Sheriff was aware that it is unlawful to withhold proper medical care from any person who is in custody.

196.    Defendant Phillips was subjectively aware that Mr. Brown had a serious medical condition and that he needed additional medical attention. Mr. Brown was unable to walk and Mr. Brown stated both that he could not feel his legs and that he could not walk. Mr. Brown's condition was objectively serious.

197.    Nurse Phillips was deliberately indifferent to the serious medical needs represented by Mr. Brown's condition, and that indifference delayed proper medical care for Mr. Brown.

198.    Mr. Brown has been injured as a result of the conduct of Defendant Phillips, and was deprived of the rights, privileges or immunities secured to him by the Constitution and laws of the United States, and is entitled to actual and punitive damages, in amounts to be determined by the finder of fact, to redress his injuries as a result of that deprivation and its consequential injuries.

### For a Fifth Cause of Action:
### Violation of the 42 U.S.C. 1985(3), Conspiracy to Interfere With Civil Rights
(Count 1: Against Defendants Moore, Kursch and Bunn individually)

199.    Allegations above are incorporated as if fully stated.

200.    Mr. Brown was injured in his person and was deprived of his right and privilege as a citizen of the United States to receive adequate medical care while he was in the custody of the Charleston Police Department and the Charleston County Detention Center.

201.    Defendants Moore, Bunn and Kursch each took one or more overt acts in furtherance of their joint action to conspire together among themselves for the purpose of depriving Mr. Brown of adequate medical care at MUSC and at the Charleston County Detention Center by their inaction, withholding information, and mischaracterizing information.

202.    By their conduct, the individual defendants Kursch, Bunn and Moore directly, as well as indirectly, deprived Mr. Brown of the equal protection of the laws, and of equal privileges and immunities under the laws.  Kursch, Bunn and Moore coordinated action so as to deprive EMS, MUSC and Defendant Bush of accurate information about Mr. Brown and his arrest, and Bunn and Moore coordinated with each other to deprive the Charleston County Detention Center of accurate information about Mr. Brown and his arrest after Mr. Brown was transported by them to the Detention Center.

203.    Mr. Brown seeks monetary relief for his damages for the coordinated actions of the individual defendants Kursch, Bunn and Moore in omitting vital information about his arrest when his medical care was being first delivered, by EMS, and later at MUSC under supervision of Dr. Bush.  Omissions in Mr. Brown's medical care were intended by defendants to occur.  Defendants Kursch, Moore and Bunn were aware of his serious medical condition, acted in conjunction with one another so as to

conceal the history of the arrest, which included trauma, and failed to disclose that to EMS and MUSC personnel.

204.     Mr. Brown is entitled to actual and punitive damages against defendants for his injuries and deprivation of rights, and for the injuries caused during the delay.

### For a Sixth Cause of Action: Neglect to Prevent under 42 USC § 1986 Count 1: Against Individual Defendants Kursch, Bunn and Moore

205.     Allegations above are incorporated as if fully stated.

206.     Defendant Kursch had knowledge that neither defendant Bunn nor defendant Moore had disclosed to MUSC the actual circumstances attending Mr. Brown's arrest, and that withholding the information deprived Mr. Brown of the equal protection of the laws and his due process rights.

207.     Defendant Bunn had knowledge that neither defendant Kursch nor defendant Moore had disclosed to MUSC the actual circumstances attending Mr. Brown's arrest, and that withholding the information deprived Mr. Brown of the equal protection of the laws and his due process rights.

208.     Defendant Moore had knowledge that neither defendant Bunn nor defendant Kursch had disclosed to MUSC the actual circumstances attending Mr. Brown's arrest, and that withholding the information deprived Mr. Brown of the equal protection of the laws and his due process rights.

209.     Each of defendants Kursch, Moore, and Bunn had the power to prevent the concealment of the actual circumstances attending Mr. Brown's arrest by himself making that disclosure, and by so doing prevent Mr. Brown from being deprived of his rights to adequate medical care, and prevent him from the injuries during the delay.

210.     By reasonable diligence each of the defendants Kursch, Moore and Bunn

could have easily taken it upon himself to disclose the actual circumstances attending Mr. Brown's arrest.  Each consciously chose not to do so.

211.    Mr. Brown was entitled to equal privileges and immunities under the laws and Constitutions of South Carolina and the United States, and to due process, even after he was detained by defendants Kursch, Moore and Bunn.

212.    Kursch, Moore and Bunn each wrongfully neglected or refused to prevent Mr. Brown's rights from being impeded and interfered with, and are responsible for all damages caused by their wrongful actions and inactions.

213.    Mr. Brown is entitled to actual and punitive damages as a result of the conduct of Kursch, Moore and Bunn, against each of them individually.

### For a Seventh Cause of Action: Neglect to Prevent under 42 USC § 1986 Count 2: Against Individual Defendants Bunn and Moore

214.    Allegations above are incorporated as if fully stated.

215.    Defendant Bunn had knowledge that defendant Moore had not disclosed to deputies or personnel at the Charleston County Detention Center the actual circumstances attending Mr. Brown's arrest, or that Mr. Brown's condition had deteriorated since his arrest, and that withholding the information deprived Mr. Brown of the equal protection of the laws and his due process rights.

216.    Defendant Moore had knowledge that defendant Bunn had not disclosed to deputies or personnel at the Charleston County Detention Center the actual circumstances attending Mr. Brown's arrest, or that Mr. Brown's condition had deteriorated since his arrest, or that Bunn had submitted information that did not accurately disclose Mr. Brown's history, and that withholding the information deprived Mr. Brown of the equal protection of the laws and his due process rights.

34

217.    Each of defendants Moore and Bunn had the power to disclose the actual circumstances attending Mr. Brown's arrest, and that Mr. Brown's condition had deteriorated since his arrest, by Moore or Bunn himself making that disclosure, and by so doing prevent Mr. Brown from being deprived of his rights to adequate medical care.

218.    By reasonable diligence each of defendants Moore and Bunn could have easily taken it upon himself to disclose to personnel at the Charleston County Detention Center the actual circumstances attending Mr. Brown's arrest and that his condition had deteriorated since his arrest.  Each consciously chose not to do so.

219.    Mr. Brown was entitled to equal privileges and immunities under the laws and Constitutions of South Carolina and the United States, and to due process, even after he was detained by defendants Moore and Bunn.

220.    Moore and Bunn each wrongfully neglected or refused to prevent Mr. Brown's rights from being impeded and interfered with, and are responsible for all damages caused by their wrongful actions and inactions, and for the injuries to Mr. Brown during the delay.

221.    Mr. Brown is entitled to actual and punitive damages as a result of the conduct of Moore and Bunn, against each of them individually.

### For an Eighth Cause of Action:
### Violation of the State Tort Claims Act
(Against each of the City of Charleston and the Sheriff of Charleston County)

222.    Allegations above are incorporated as if fully stated.

223.    For claims made under state law, the City of Charleston is responsible for the actions of its employee police officers, and for properly training them.

224.    For claims made under state law, Al Cannon as the Sheriff of Charleston County is responsible for the conduct of his deputies, and for the conduct of his jailers

(including his jailer contractors), not through *respondeat superior*, which imposes liability only for actions within the scope of employment, but because the action of each deputy and jailer (including jailer contractors) is a representative act, on behalf of the sheriff, as if done by the sheriff, regardless of the scope of employment. As to jailers at the Detention Center, S.C. Code § 24-5-10 provides "the sheriff shall be liable for" each of his jailers, including those jailer functions the Sheriff chooses to delegate by contract.

225.    In this complaint, each of the personnel interacting with Mr. Brown at the Charleston County Detention Center, including contractors, acted within the course and scope of his or her employment.

226.    The Sheriff has final decision-making authority for administration of the Sheriff's office. He is responsible for staffing, training, supervising, contracting, and controlling his deputies and jailers, including the contract medical personnel, who assist him in operating the Detention Center.

227.    Defendants Cannon and the City of Charleston each assumed the duty for, and were responsible to Mr. Brown for, training their respective personnel and contractors to properly provide adequate medical care to individuals during their detention. Those duties were performed in a grossly negligent manner.

228.    The City of Charleston was grossly negligent in not properly training and supervising city police officers sufficient to cause them to properly disclose the facts needed to deliver proper medical care to Mr. Brown when he was with EMS and at MUSC on February 1, or to properly disclose the facts needed to evaluate Mr. Brown's deteriorated medical condition when Mr. Brown arrived from MUSC to the Detention Center on February 1.

229.    The Sheriff of Charleston County was grossly negligent in not properly training and supervising Detention Center personnel, including his contractors, to assess and accept persons such as Mr. Brown for confinement at the Detention Center.   Mr. Brown's condition had deteriorated after his arrest.  Detention Center personnel performed on February 1 an insufficient examination of Mr. Brown, who could not walk, when the Detention Center had a report from MUSC which said Mr. Brown had full control of his appendages.  Had Mr. Brown's condition been properly assessed as it presented, Detention Center personnel would have observed Mr. Brown's medical condition had deteriorated from that presented on his record from MUSC, Mr. Brown would have been returned to MUSC.  Alternatively, had a full disclosure been made by Officers Moore and Bunn, Mr. Brown would have been returned to MUSC on February 1.

230.    As a direct and proximate result of the negligence of the City of Charleston and the Sheriff of Charleston County, through their respective employees and agents, Mr. Brown sustained injuries during the period of the delay, permanent physical injury, violations of his constitutional rights under the Fifth, and Fourteenth Amendments to the United States Constitution to due process and other rights without impairment; violations of his constitutional rights under the South Carolina Constitution; physical pain and suffering and emotional trauma; impairment of his future opportunities, including employment opportunities due to his paralysis, and out of pocket costs, fees, and attorneys fees associated with this action.

231.    Mr. Brown is entitled to injunctive relief as well as actual damages against the City of Charleston and the Sheriff of Charleston County in his official capacity under the South Carolina Tort Claims Act, for Mr. Brown's losses and actual damages.

**For a Ninth Cause of Action: Declaratory Relief**

232.    Allegations above are incorporated into this cause of action as if fully stated.

233.    Pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 1983 and 1986, the court should declare that the inadequate protections made available to Mr. Brown by each defendant violated Mr. Brown's Fifth and Fourteenth Amendment rights to the United States Constitution, his rights under Article 1 § 3 of the South Carolina Constitution, and that a continuing policy of inadequate medical care for detainees by withholding information pertinent to their medical care violates Mr. Brown's rights under the Fifth and Fourteenth Amendments.

**For a Tenth Cause of Action:**
**Deprivation of Rights Under 42 USC §§ 1981 and 1983**
(Against Defendants Medical University of South Carolina and Jeffrey Bush, M.D.)

234.    Allegations above are incorporated into this count as if fully stated.

235.    Mr. Brown is a citizen of the United States.

236.    Mr. Brown's detention and arrest constituted a "seizure" under the Fourth Amendment to the Constitution of the United States.

237.    Defendant Medical University of South Carolina (MUSC) is an entity created and funded by the State of South Carolina.

238.    Jeffrey Bush, M.D., at all times pertinent to this complaint was employed at MUSC, and acted on behalf of MUSC.  In that capacity, he acted under color of state law and is a "person" within the meaning of 42 U.S.C. § 1983.

239.    This claim is brought against Jeffrey Bush, M.D. in his individual capacity for damages, and against MUSC in its institutional capacity for injunctive relief.

240. While he was under police custody at MUSC, Mr. Brown was entitled to adequate medical care under the protections of the Fifth and Fourteenth Amendments. Additionally, at all times during his detention, Mr. Brown was entitled to similar protections under the South Carolina constitution through Article 1 § 3.

241. As of February 1, 2010, a reasonable person would have known that it was clearly established that Mr. Brown was entitled under the Fifth and Fourteenth Amendments to have adequate medical care during his confinement.

242. Mr. Brown's medical condition after his arrest was objectively serious.

243. Defendant Bush subjectively knew Mr. Brown's medical condition was serious and that Mr. Brown needed medical attention. EMS delivered Mr. Brown to MUSC with precautions taken to protect his cervical spine, among other things, and those precautions were open and obvious.

244. Defendant Bush was deliberately indifferent to Mr. Brown's known serious medical needs in light of Mr. Brown arriving in full C-spine protections with a history that included loss of consciousness. No diagnostic exploration was done for Mr. Brown to assess his cervical spine before he was removed from C-spine protections.

245. After Mr. Brown arrived at MUSC, Defendant Bush assessed Mr. Brown as having full motor control. Before Mr. Brown left MUSC, while he was under the care of Defendant Bush, Mr. Brown reported losing the use of, and feeling in, his legs. Nothing was done to pursue that changed condition of Mr. Brown's.

246. Nothing was done to change Mr. Brown's medical record to reflect he had less than full motor control.

247. Mr. Brown had no use of his legs when he was removed from MUSC, but MUSC and Defendant Bush sent with Mr. Brown a record which indicated he had full

39

use of his legs.  Defendant Bush was deliberately indifferent to Mr. Brown's changed condition.

248.    MUSC had a policy or practice to permit physicians to exercise deliberate indifference to the needs of persons in police custody.  MUSC should be enjoined from permitting its physicians and staff from deliberate indifference towards the medical needs of persons in police custody.

249.    Defendant Bush cleared Mr. Brown for transport to the jail without reviewing that the use Mr. Brown had of his legs had changed, and without altering his assessment that Mr. Brown had full use of his legs.

250.    Defendant Bush was deliberately indifferent to the changed condition of Mr. Brown's legs that occurred at MUSC.  That indifference delayed proper treatment for Mr. Brown.  It would be more than 14 hours before Mr. Brown was returned to MUSC for proper treatment.

251.    Prior to February 1, 2010, defendant Bush was aware that it is unlawful to deliberately disregard serious medical needs of a person in police custody, and to operate using a policy or custom to disregard serious medical needs or to incorrectly report a person's medical condition.

252.    MUSC has inadequate procedures and training sufficient to prohibit its physicians from deliberately disregarding serious medical needs of persons in police custody.  MUSC should be enjoined from failing to develop adequate training and procedures sufficient for that purpose.

253.    That custom or policy of MUSC delayed proper medical treatment for Mr. Brown, and deprived him of the rights, privileges, or immunities secured to him by the Constitution and laws of the United States as well as of South Carolina.

254.    Unless enjoined, MUSC will continue to operate in a manner which deprives detainees such as Mr. Brown of constitutionally protected rights.

255.    Mr. Brown is entitled to injunctive relief sufficient to prevent MUSC from failing to train and operate its emergency facilities so as to restrict personnel from deliberately disregarding serious medical needs of persons in police custody.

256.    Mr. Brown's proper medical care was delayed as a result of the deliberate indifference of Defendant Bush.  Mr. Brown was deprived of the rights, privileges or immunities secured to him by the Constitution and laws of the United States and South Carolina, and is entitled to actual and punitive damages against Dr. Bush, in amounts to be determined by the finder of fact, to redress his injuries as a result of that deprivation and its consequential injuries.  Mr. Brown is also entitled under this cause of action to injunctive relief against MUSC to alter its policy and practice enabling deliberate disregard of serious medical needs for persons in police custody.

**For an Eleventh Cause of Action:**
**Violation of the 42 U.S.C. 1985(3), Conspiracy to Interfere With Civil Rights**
(Against defendants Sheriff of Charleston County,
Moore, Bunn, Phillips and Thomas)

257.    Allegations above are incorporated into this cause of action as if fully stated.

258.    The Sheriff of Charleston County is sued in this cause of action for only injunctive relief.

259.    Defendants Moore, Bunn, Phillips, and Thomas are sued for actual and punitive damages in their individual capacities.  Each acted under color of state law.

260.    Mr. Brown was injured in his person during his arrest and was deprived of his right and privilege as a citizen of the United States to receive adequate medical care

while he was in the custody of the Charleston police department and the Charleston County Detention Center.

261.    From the circumstances of Mr. Brown's condition when he arrived at the Detention Center, regardless of information conveyed or distorted or misrepresented by Bunn and Moore, each Defendant identified in this cause of action had an independent obligation to Mr. Brown, because each acted under color of state law, to understand Mr. Brown's condition and provide him adequate medical care.

262.    The collective actions to refuse Mr. Brown medical care were part of an implicit joint agreement to disregard Mr. Brown's open and obvious medical condition.

263.    Each Defendant took one or more overt acts in furtherance of joint action to conspire together among themselves to deprive Mr. Brown of adequate medical care.

264.    Defendants Moore and Bunn were aware that Mr. Brown's condition when he arrived at the Detention Center was worse than it had been when Mr. Brown was arrested.  Moore and Bunn collaborated to provide to the Detention Center personnel misinformation about Mr. Brown, including that he had "fallen" while running, and that his injuries were not genuine.  Bunn provided false information in writing.  Thomas observed Mr. Brown's condition and falsified information about Mr. Brown's injuries. Phillips elicited explicitly from Mr. Brown that he could neither walk nor feel his legs, but took no action in response to that information and collaborated to have Mr. Brown deposited into a cell at the Detention Center rather than provide him medical care.

265.    Each Defendant took one or more overt acts in furtherance of their joint action to conspire together among themselves for the purpose of depriving Mr. Brown of adequate medical care.

266.    Defendants each knew, or should have known, their refusal to provide adequate medical care would deprive Mr. Brown of the equal protection of the laws, and of equal privileges and immunities under the laws.

267.    Mr. Brown is entitled to monetary relief for his damages from the coordinated actions of the individual defendants as set forth above which were intended to deprive Mr. Brown of adequate medical care, knowing that his medical condition was serious and required advanced care, and knowing also that Mr. Brown would be injured by the delay.  Mr. Brown is entitled to punitive damages for the conduct of the individual defendants in consciously depriving Mr. Brown of his rights and causing him injury.

268.    The Sheriff of Charleston County operates the Detention Center using a policy or practice which permits individuals employed there, and its contractor's employees, to elect whether or not to provide adequate medical care to detainees.  Unless enjoined, the Sheriff will continue to operate the Detention Center with inadequate protections for the constitutional rights of persons detained.

269.    Mr. Brown is entitled to actual and punitive damages against each of the individual defendants for his injuries and deprivation of rights, and to injunctive relief against the Sheriff of Charleston County to enjoin him from failing to develop proper policies and procedures to prevent persons detained from being deprived of their right to adequate medical care.

**For a Twelfth Cause of Action:**
**Deprivation of Rights Under 42 USC §§ 1981 and 1983**
(Against Defendants Medical University of South Carolina and Jeffrey Bush, M.D.

270.    Allegations above are incorporated as if fully stated.

271.    Before his discharge on February 1, Jeffrey Bush, M.D. and MUSC personnel were told that Mr. Brown could neither feel his legs or use his legs.

272.    When he left MUSC, Mr. Brown was unable to use his legs.

273.    Mr. Brown is a citizen of the United States.

274.    Mr. Brown's detention and arrest constituted a "seizure" under the Fourth Amendment to the Constitution of the United States.

275.    Jeffrey Bush, M.D., at all times pertinent to this complaint was employed at MUSC, and acted on behalf of MUSC.  In that capacity, he acted under color of state law.

276.    This claim is brought against Jeffrey Bush, M.D. in his individual capacity for damages, and against MUSC in its institutional capacity for injunctive relief.

277.    While he was under police custody at MUSC, Mr. Brown was entitled to adequate medical care, as alleged above.

278.    As of February 1, 2010, a reasonable person would have known that it was clearly established that plaintiff Brown was entitled under the Fifth and Fourteenth Amendments to have adequate medical care during his confinement.

279.    Mr. Brown's medical condition after his arrest was objectively serious.

280.    Jeffrey Bush, M.D. subjectively knew Mr. Brown's medical condition was serious and that Mr. Brown needed medical attention.  EMS delivered Mr. Brown to MUSC with precautions taken to protect his cervical spine, among other things.

281.    Independent of whether Defendant Kursch, Bunn, or Moore informed MUSC personnel and Defendant Bush of the trauma associated with Mr. Brown's arrest, Defendant Bush had an independent duty to properly assess Mr. Brown's condition.

282.    Mr. Brown himself reported to MUSC personnel that he could not feel or use his legs.

44

283.    Jeffrey Bush, M.D. was deliberately indifferent to Mr. Brown's known serious medical needs in light of that information. None of the substantial diagnostic and remedial precautions taken for Mr. Brown starting February 2, 2010 were taken for him on February 1, 2010, even though it was known such precautions and procedures were called for by the nature of Mr. Brown's condition.

284.    MUSC has a policy or practice to permit physicians to exercise deliberate indifference to the needs of persons in police custody. MUSC should be enjoined from permitting its physicians and staff from deliberate indifference towards the medical needs of persons in police custody.

285.    But for the deliberate indifference by Defendant Bush, proper medical care for Mr. Brown was delayed over 14 hours.

286.    Prior to February 1, 2010, defendant Bush was aware that it is unlawful to deliberately disregard serious medical needs of a person in police custody, and to operate using a policy or custom to withhold such information.

287.    MUSC has inadequate procedures and training sufficient to prohibit its physicians from deliberately disregarding serious medical needs of persons in police custody. MUSC should be enjoined from failing to develop adequate training and procedures sufficient for that purpose.

288.    That custom or policy by MUSC, and the conduct of Defendant Bush, deprived Mr. Brown of the rights, privileges, or immunities secured to him by the Constitution and laws of the United States as well as of South Carolina in delaying his proper medical care for over 14 hours.

289.    Unless enjoined, MUSC will continue to operate in a manner which deprives detainees such as Mr. Brown of constitutionally protected rights.

290.    Mr. Brown was presented to the Emergency Department at MUSC on February 1, 2010, where he was seen and examined by MUSC personnel.

291.    At the time of his presentation to the Emergency Department, MUSC personnel either knew or should have known that Mr. Brown had each of the following significant medical problems:

a.    a cervical collar;
b.    placement on a spine or back board;
c.    a history of trauma;
d.    neurological deficits including decreased strength, sensation and movement in his extremities;
e.    abnormal vital signs; and
f.    a potential injury to his spine.

292.    Despite these conditions, the Emergency Department personnel did not appropriately "clear" the Plaintiff's spine before releasing him into police custody for transport to the Charleston County Detention Center, and violated the standard of care in doing so.

293.    Before he left the Emergency Department, Mr. Brown reported that he was unable to use or feel his legs.

294.    No proper review was made of Mr. Brown's condition, and Defendant Bush neither updated nor corrected Mr. Brown's medical chart to reflect changes to Mr. Brown's actual condition.

295.    Mr. Brown was "cleared for jail" with an inaccurate, and misleading, medical record.

296.    At the time of he was cleared for release to the jail by MUSC, Mr. Brown had, and was known to have, each of the following significant medical problems:

a.    inability to walk;
b.    neurological deficits including decreased strength, sensation and movement in his extremities;
c.    abnormal vital signs;

46

d.    incontinent of bowel;
e.    a potential spine injury

297.    Despite these conditions, Defendant Bush provided no treatment for the conditions, made no correction to Mr. Brown's record about those conditions, and discharged him without addressing his symptoms.

298.    Proper medical care for Mr. Brown was delayed for over 14 hours as a direct and proximate result of the deliberate indifference of Defendant Bush in (a) failing to properly treat Mr. Brown's known condition on February 1, and (b) providing false information to the Detention Center at the time of Mr. Brown's discharge from MUSC.

299.    Mr. Brown suffered irreversible paraplegia.

300.    Defendant Bush was indifferent in the following respects:

a.    failing to properly assess Mr. Brown's neurological condition;
b.    failing to properly record information about Mr. Brown's neurological condition;
c     failing to obtain appropriate tests including but not limited to imaging studies of his spine;
d.    failing to consult a neurosurgeon or other physician specializing in the treatment of injuries to the spine and spinal cord;
e.    failing to diagnose Mr. Brown with fractured cervical vertebrae;
f.    failing to diagnose Mr. Brown with a spinal cord injury;
g.    failing to treat Mr. Brown for a spinal cord injury by, among other things, administering medication, admitting him to the hospital, monitoring his condition and arranging for him to have proper care;
h.    in failing to allow Mr. Brown's mental status to normalize before conducting a neurological examination;
i.    in clearing Mr. Brown's spine and removing him from the spinal precautions at a time when he was noted to have altered mental status;
j.    in failing to properly account for the lack of normal strength, sensation and movement in Mr. Brown's extremities, and the changed state of his extremities while at MUSC;
k.    in failing to properly account for Mr. Brown's abnormal vital signs and the changes to those vital signs;
l.    in failing to properly account for Mr. Brown's bowel incontinence;
m.    in failing to properly record or account for Mr. Brown's inability to walk;
n.    in failing to have in place appropriate protocols for the assessment of patients presenting with potential spinal cord injuries or, if having the same, then in failing to abide by them;
o.    in improperly diagnosing Mr. Brown with a drug overdose when his

symptoms and clinical condition did not match such a diagnosis;

p.     in improperly releasing Mr. Brown from the Emergency Department without a sufficient period of observation for a patient thought to be suffering from a drug overdose treatable with Narcan and without proper records accurately indicating his condition at the time of release;

q.     in improperly removing the cervical collar and backboard precautions from Mr. Brown before even obtaining a urine sample for use in performing urine drug screen testing;

r.     in allowing Mr. Brown to be discharged from the emergency department by his legs dragging along the floor with his hands cuffed behind his back;

s.     in failing to provide accurate information about Mr. Brown to the Detention Center;

t.     in failing to properly monitor the progression of Mr. Brown's condition while at MUSC;

u.     in such other particulars as the evidence through discovery and trial may otherwise tend to prove or suggest.

301.    The delay in his treatment caused Mr. Brown injury.  Mr. Brown was subjected to injury during the delay in getting for him proper medical care, as alleged above.  His condition was not monitored for 14 hours, decreasing his chances of a successful recovery.  He had the anxiety associated with being unable to feel or move his legs, and being unable to control his bowels, compounded by having his complaints about his condition being disregarded.  He was left on the floor of a jail cell and laid in his own feces.

302.    Mr. Brown is entitled to injunctive relief sufficient to prevent the MUSC from failing to train and operate its emergency facilities so as to restrict personnel from deliberately disregarding serious medical needs of persons in police custody.

303.    Mr. Brown has been injured as a result of the conduct of the defendant Bush.  He was deprived of the rights, privileges or immunities secured to him by the Constitution and laws of the United States and South Carolina, and is entitled to actual and punitive damages against him, in amounts to be determined by the finder of fact, to redress his injuries as a result of that deprivation and its consequential injuries.

**For a Thirteenth Cause of Action:**
**Medical Malpractice against MUSC**

304.    Allegations above are incorporated as if fully stated.

305.    Mr. Brown presented to the Emergency Department at MUSC on February 1, 2010, where he was seen and examined by MUSC personnel.

306.    All of the MUSC personnel who treated Mr. Brown, including Jeffrey Bush, M.D., were MUSC's actual and apparent agents, servants and employees and for whose conduct MUSC is legally liable as a state institution.

307.    At the time of his presentation to the Emergency Department, MUSC personnel either knew or should have known that Mr. Brown had each of the following significant medical problems:

    a.    a cervical collar;
    b.    placement on a spine or back board;
    c.    a history of trauma;
    d.    neurological deficits including decreased strength, sensation and movement in his extremities;
    e.    abnormal vital signs; and
    f.    a potential injury to his spine.

308.    Despite these conditions, the Emergency Department personnel did not appropriately "clear" the Plaintiff's spine before releasing him into police custody for transport to the Charleston County Detention Center, and violated the standard of care in doing so.

309.    While present in the Emergency Department, Mr. Brown's condition changed as to being able to use his legs and feel his legs. His condition was related to action and inaction by Emergency Department Personnel. No proper review was made of his condition, and his medical record was neither updated nor corrected to reflect changes

to Mr. Brown's actual condition.

310.     Mr. Brown was "cleared for jail" with an inaccurate, and misleading, medical record.

311.     At the time of he was cleared for release to the jail by MUSC, Mr. Brown had each of the following significant medical problems:

     a.     inability to walk;
     b.     neurological deficits including decreased strength, sensation and movement in his extremities;
     c.     abnormal vital signs;
     d.     incontinent of bowel;
     e.     a potential spine injury

312.     Despite these conditions, MUSC made no correction to Mr. Brown's record and discharged him without addressing his symptoms.  MUSC failed to comply with the standard of care in doing so.

313.     Mr. Brown suffered irreversible paraplegia, but his proper medical care was also delayed for over 14 hours as a direct and proximate result of the false information conveyed about him by MUSC.    The delay caused Mr. Brown injury. Negligent, grossly negligent, willful, wanton and reckless actions and conduct of the actual and apparent agents, servants and employees of MUSC, combined and contributed in the following particulars to delay proper medical care for Mr. Brown:

     a.     failing to properly assess Mr. Brown's neurological condition;
     b.     failing to properly record information about Mr. Brown's neurological condition;
     c     failing to obtain appropriate tests including but not limited to imaging studies of his spine;
     d.     failing to consult a neurosurgeon or other physician specializing in the treatment of injuries to the spine and spinal cord;
     e.     failing to diagnose Mr. Brown with fractured cervical vertebrae;
     f.     failing to diagnose Mr. Brown with a spinal cord injury;
     g.     failing to treat Mr. Brown for a spinal cord injury by, among other things, administering medication, admitting him to the hospital, monitoring his condition and arranging for him to have proper care;
     h.     in failing to allow Mr. Brown's mental status to normalize before

conducting a neurological examination;

i.      in clearing Mr. Brown's spine and removing him from the spinal precautions at a time when he was noted to have altered mental status;

j.      in failing to properly account for the lack of normal strength, sensation and movement in Mr. Brown's extremities, and the changed state of his extremities while at MUSC;

k.      in failing to properly account for Mr. Brown's abnormal vital signs and the changes to those vital signs;

l.      in failing to properly account for Mr. Brown's bowel incontinence;

m.      in failing to properly record or account for Mr. Brown's inability to walk;

n.      in failing to have in place appropriate protocols for the assessment of patients presenting with potential spinal cord injuries or, if having the same, then in failing to abide by them;

o.      in improperly diagnosing Mr. Brown with a drug overdose when his symptoms and clinical condition did not match such a diagnosis;

p.      in improperly releasing Mr. Brown from the Emergency Department without a sufficient period of observation for a patient thought to be suffering from a drug overdose treatable with Narcan and without proper records accurately indicating his condition at the time of release;

q.      in improperly removing the cervical collar and backboard precautions from Mr. Brown before even obtaining a urine sample for use in performing urine drug screen testing;

r.      in allowing Mr. Brown to be discharged from the emergency department by his legs dragging along the floor with his hands cuffed behind his back;

s.      in failing to provide accurate information about Mr. Brown to the Detention Center;

t.      in failing to properly monitor the progression of Mr. Brown's condition while at MUSC;

u.      in such other particulars as the evidence through discovery and trial may otherwise tend to prove or suggest.

314.    Already filed with the court is an affidavit related to the alleged medical malpractice deviations by MUSC.    In addition, Mr. Brown was subjected to injury during the delay in getting for him proper medical care, as alleged above.

315.    Mr. Brown is entitled to recover actual damages from MUSC in an amount to be determined by the trier of fact.


**Demand for Jury Trial**

316.    Mr. Brown demands a trial by jury.

**Relief Sought**

Wherefore, Mr. Brown requests that this Court:

317.    Enjoin defendant City of Charleston from failing to have adequate procedures sufficient to compel its police officers to fully and accurately report the history of a person in their custody that requires medical care; from failing to develop adequate training and procedures sufficient for that purpose; from ceasing its custom or policy for its officers to withhold information whenever medical needs have arisen during the course of an arrest; from failing to expend sums sufficient to have the proper training for its personnel to effectively disclose information for purposes of providing adequate medical care for detainees; and from operating its police department in a manner which deprives detainees such as Mr. Brown of constitutionally protected rights.

318.    Actual and punitive damages, individually, against defendants Kursch, Moore and Bunn, and injunctive relief against them to enjoin them from withholding information against any other detainee in need of medical care.

319.    Actual damages and injunctive relief under the South Carolina Tort Claims Act against the City of Charleston to enjoin it from failing to develop and fund proper policies and training for its officers to accurately and fully report information to medical providers, and Al Cannon, Sheriff of Charleston County in his official capacity, to enjoin him from (a) failing to develop and fund proper training of deputies in assessing detainees and providing them medical care, (b) failing to require contractors to comply with minimum standards to satisfy constitutional protections for detainees, and to accurately record the condition of detainees who present to the Detention Center, and (c) failing to staff, operate and supervise personnel, both deputies and medical personnel at

the Detention Center, and to sufficiently train those personnel, so as to provide persons detained proper medical care.

320.    Injunctive relief to enjoin MUSC from failing to develop adequate procedures and training sufficient to prohibit its physicians from deliberately disregarding serious medical needs of persons in police custody; from operating with a custom or policy that deprives arrested persons such as Mr. Brown of the rights, privileges, or immunities secured to him by the Constitution and laws of the United States as well as of South Carolina by deliberately disregarding serious medical needs of persons in police custody.

321.    Actual and punitive damages against defendant Jeffrey Bush, M.D., for deliberate indifference to Mr. Brown's serious medical needs.

322.    Actual and punitive damages against defendants Kursch, Moore, Bunn, Bush, Phillips, and Thomas for deliberate indifference and delay in providing Mr. Brown proper medical care and for their concerted and joint action to delay his proper medical care.

323.    An order which enjoins all defendants, their agents, employees, assigns, and all persons acting in concert or participating with them from violating the rights of individuals to adequate medical care under state and federal constitutions.  Defendants should each be enjoined from failing to properly provide adequate medical care for detainees.

324.    Pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 1983 and 1986, declaratory relief that inadequate protections made available to Mr. Brown violated Mr. Brown's Fifth and Fourteenth Amendment rights to the United States Constitution, his rights under Article 1 § 3 of the South Carolina Constitution, and that a continuing policy

of inadequate medical care for detainees by withholding information pertinent to their medical care violates Mr. Brown's rights under the Fifth and Fourteenth Amendments.

325.    Award compensatory and punitive damages to Mr. Brown as determined by the finder of fact against the individual defendants under the claims under federal law.

326.    Award compensatory damages to Mr. Brown as determined by the finder of fact against all defendants for the claims under state law.

327.    Award Mr. Brown his costs of suit and reasonable attorneys' fees under 42 U.S.C. § 1988; and

328.    For such other and further relief as the court shall deem just and proper.

Respectfully submitted.

Alex Apostolou
215 East Bay Suite 505F
Charleston SC 29401
843-853-3637
alexapostolou@bellsouth.net


  s/ Gregg Meyers
Gregg Meyers
Jeff Anderson & Associates, PA
1 Poston Road, Suite 110
Charleston SC 29407
843-556-1025
attygm@gmail.com


Rob Ransom
Ransom & Leventis
1913 Bull Street
Columbia SC 29201
803-765-2383
bertcone@aol.com

Attorneys for Plaintiff